Good morning, Your Honors. May it please the Court, my name is Charles Muller and I appear this morning on behalf of the Alaska Department of Health and Social Services. In thinking about how I could best assist the Court in assessing the issues raised in this case, I thought it might be helpful to give just a bit of background that reveals how we got to where we are today. For approximately the last decade or so, a number of states that participate in the Medicaid program were able to increase their federal funding for that program by increasing their payment rates for various categories of health care providers like hospitals and nursing homes and other entities. The federal regulations establish what is known as an upper limit, an upper payment level at which the federal government will match payments made to those providers. Most states had not been paying anywhere near that level. By increasing the payments to that upper payment limit level and then receiving transfers from those providers who were public in nature, which is permissible under the law, the states could capture the federal dollars at the same time without any increased cost to the states themselves. A number of state plans were submitted to the federal agency for approval of such transactions and were more or less routinely approved. Approximately several years after this practice was in place, it began to be reviewed by the Inspector General and various other overseeing agencies, which in many cases criticized these practices as causing an increase in federal outlays. Consistently, the federal agency, CMS, which is the defendant agency here, the respondent agency, explained in response to those various reports that although the practice was perhaps questionable as a matter of policy, it was entirely legal and that there was nothing the agency could do to prevent it. The reporting agencies nonetheless pursued this, and at some point in the year 2000, I believe, the agency proposed some rules that would modify these practices. The nature of the proposed rule was to redefine or modify the definition of what these upper payment limits were, and the effect of those modifications was to reduce the amount of gain that could be achieved from these types of transactions. Shortly after the rule was proposed, the Congress, as part of one of its comprehensive statutes, enacted legislation directing the agency to adopt the rule in final form with certain modifications that the Congress imposed, which aren't relevant to this case. In response to that, the agency did adopt its modified regulation in early 2001. One of the elements of that modification was to change the application of the upper payment limit for tribal facilities. Tribal facilities exist in Alaska and a number of the lower 48 states that have significant American Indian populations. That change subjected the payments to tribal facilities to the upper payment limit that is contained in a regulation, section 447.325, which is involved in this case and cited in the briefs. At about the time all this was happening, the regional office of CMS, the agency, actually contacted the state of Alaska and brought to its attention the opportunity to earn more federal dollars in this way. Shortly after the regulation was modified and Alaska saw what the new upper payment limit was for tribal facilities, it submitted a plan amendment to the federal agency that proposed to increase payments to its tribal facilities to the newly imposed upper payment limit, which would have resulted in a significant increase in the federal dollars available to the state for its Medicaid program. And it proposed, in keeping with what other states had done, to receive transfers from those facilities for the large majority of that new funding. Was that a manufactured device to get the money? Well, you could call it that, Your Honor. Well, no. That was its purpose. Well, I guess I'm following you. This is very helpful. But when the government, when you say the federal government alerted the state, the CMS alerted the state that they could get more federal funds, if we're really dealing with costs, costs didn't go up somewhere. They manufactured costs to take advantage of more money. Either that or the facilities weren't getting enough money to do their job and they just got realistic and paid them more money to do their job, except for, in fact, in this case, the facility only gets 10% and the rest is kicked back to the state. So when I say manufactured, this is a total mystery to me because money is rolling around like crazy. And now the question is whether or not there can be some review of what is being done with setting the cost, which starts this program going. Once they set the cost, the reimbursement cost, then this program starts rolling, including the 90% kickback and on and on. So, I mean, if the federal government hadn't told them, there's more, according to what you're telling us, if the federal government hadn't told them, if CMS had not said, oh, you can get more money, apparently there would have been no adjustment. Well, I don't know whether the state would have come across it anyway. Well, that may or may not be, but your presentation tells us that upon being notified, you can get more money, all of a sudden the system was ratcheted up. Correct. Well, that's absolutely correct, what happened. There's no question about that. Okay, as long as I understand. That's consistent with what happened elsewhere in the country. Tell me what the basis is for 90% of the additional money going back to the state. What justifications does the state have for asking from these facilities that 90% of this additional money comes to them instead of staying with the facility? Well, the justification, and the justification for doing the transaction in its entirety, is to provide the state with the wherewithal to maintain its overall program of care. You're siding off at a thing. Are you saying that a purpose of the federal part of the program is to pay money to the Indian facilities and thereby subsidize other costs to the state within the Medicaid program? Is that a legitimate purpose? I think it is legitimate. That is, in fact, the purpose. I would be perfectly open about that. Even though the amount of money going to the state is purportedly justified based on what the reasonable costs of the facilities are for the Indian facilities? No, I believe that is not correct, Your Honor. The one thing that's clear in this muddled mess is that payments to the facilities do not have to be based upon causes. That is very specifically the case today as a result of an act of Congress in 1997. What are they based on then? Just whatever you can get out of the federal government? They're based on two different things, I would say. Number one, you base your payments to your facilities on whatever policy you choose to pursue in paying facilities, which can be price-based, cost-based, market-based, whichever you want to. I mean, the state has a wide choice. But it has to be based on some reality then. Okay, so cost-based, price-based, market-based, but not just how much money I can get out of the federal government. Well, that is part two, because part two is a significant element of this program, has turned out to be that it is possible to earn more money within the limits established by federal regulations by adding to the basic payments with the supplemental or additional transactions like the one that Alaska has proposed, which has been done all over the country by many states, most states. Let me see if I can figure out the start of this. What they did in Alaska's plan was to go to a private hospital and select, was it the prevailing rate? Is that what they called it? In other words, they selected a reimbursement rate that was based upon whatever this private hospital did. I don't know what the basis was. I tried to figure it out. I can answer that briefly, and I'll come back to it if you want. But the basic notion is the prevailing rate is rates to others, which would in Alaska be private hospitals. And so, yes, they went to the private hospitals in Anchorage and in the rest of the state and determined what the level of payment was, and that's the ceiling. The level of payment by? Whatever they charge, whatever those hospitals' charges are. So it's market rate there, anyway. The terminology in this game is very difficult, but charges are like a price list. It's like if you go to a hospital and you haven't got insurance and you're not on Medicaid or Medicare, you're going to get a bill, and that's going to show what the hospital's charges are. That's probably going to be more than their costs. In fact, it invariably is quite a bit more than their costs, and there are reasons for that. Then there's what they get paid, which tends to be if you're an insurance company, you have a contract and you pay the hospital under whatever rate scale the insurance company pays. Medicare has its own rate scale. Medicaid has its own rate scale. Well, I guess why I'm saying that is that it seems to be some of the basis of this appeal is that somehow this where you start, this rate that you establish to start the process of getting the money from the feds and then getting the 90% back, as you vary that, it varies the flow into the general fund, Medicaid fund for the state. And so in doing so, the issue was you picked the wrong rate when you went to the private hospital. And my problem in analyzing this case was I was trying to figure out what would you pick. I mean, it's a very difficult thing because there was a rural issue, there was the urban issue, there was the issue of whether you use a private hospital or public hospitals. And so how do we address that thinking in regard with what you're telling us in the history? How do we address that issue here? Because that's one of the issues on appeal we have to determine. Let me tell you how the state addressed it. The state addressed it by including in its plan the verbatim, the words of the federal regulation that established the upper limit. So whatever the federal regulation means is what the state's going to pay. The state is not going to exceed the limit. Now the federal regulation uses the term prevailing charge in the locality. And the state therefore looks to the locality, it defined the localities as being the city of Anchorage as one locality and the balance of the state as another locality, and there's a lot of history and justification for that. It then looked to see what the charges were for the facilities in the rest of the state, and there were a number of private hospitals that participate in the program, and it derived an average prevailing charge for those facilities. And that's going to be the upper limit for the payment to the tribal facilities in that locality under this plan. In the city of Anchorage, there's one tribal facility, and there's only one private facility that is comparable. And so its charges will be the limit set by the state for the allowable payments to the tribal facility. That's how we do it. The issue that has the basis for the disapproval by the federal government of the proposed plan here was that the basic ground disapproval was that the proposal did not meet the standard of economy and efficiency that's set forth in the statute. Section 1902A.30. It's the first time the agencies have ever used that section, to my knowledge, to ever invalidate a rate on the grounds that it was too high, even though the rate did not exceed the established upper payment limit. And our argument, and I would say the gist of our appeal, is that that's an inappropriate action by the agency, because it has established by regulation what the appropriate upper level for payments was, and has told states and allowed states to pay up to that level. It has reconfirmed that through the modified regulation, which it adopted at congressional direction in 2001. It has not been changed since that time. It continues to tell the Office of the Inspector General that these payments are legal, and it is inappropriate to tell the state of Alaska that it's not legal. I've been hearing this from the beginning, and I don't want to be flip about this, but you're almost saying the feds created this problem. They told us what to do, so let them live with it. In other words, it sounds like the state is not doing anything more than what the feds told them to do and authorized them to do. So therefore, if we approach sort of like that structure as a federal structure, how do we review the administrator's decision? And if we're going to use the APA standard, how do we look at that? And I would agree with you that that's an appropriate analysis of what's happened here. There's a lot of justification for that. I don't suppose the court needs to hear all this, but the state should. I think you've really explained it right. I mean, you wouldn't have done it if the federal government hadn't proposed certain rules and regulations which you followed and you did certain things. Nobody's charging anybody with a crime or anything. So now that's been done, and as you stated, they now have come in and decided to question that. We now have this extensive administrator decision. So now aren't we at the standard of review? How do we handle this? The standard of review, as we see it, is best governed by the Meade case in the Supreme Court. To begin with, we don't question the notion of deference to the federal agency here. This is a complicated statute. We know that. One of the most complicated in the federal system. And the federal agency is entitled to deference for its interpretations of it. And in this case, the agency has interpreted the statute in precisely the issues that are before us today. And those interpretations are set forth in its published regulations. In fact, I'm going to mention a couple of those just so the court can look at them. They're cited in our brief in 42 CFR 447.300. It's subpart F. This will just take me a moment. And the regulation, section 300, says in this subpart we implement section 1902A.30 of the statute. That's the statute that sets forth the economy and efficiency standard, which they say right in the ring. And section 302, a state plan must provide that the requirements of this subpart are met. Fair enough. And then section 304 sets the requirement. The requirement is the Medicaid agency must not pay more than the upper limits described in this subpart. Fair enough. And the later section in that subpart, section 325, establishes the upper limit that applies to tribal facilities. And then 304C, FFP, now that stands for federal financial participation. That means federal payments, federal funds. Is available in expenditures for payments for services that do not exceed the upper limits. And so there the agency is telling you in the regulations if you will match your payments or we'll pay our share up to the upper payment limit, which is all that it'll ask. It doesn't quite say that. It says it's available. It doesn't say we will pay. Pardon me? It doesn't say we will pay. It says it is available. FFP is available. It's not necessarily synonymous with we will pay. Your Honor, I think it is pretty synonymous. You'd like it to be. I understand. I think that's the language of the regulations. But FFP stands for federal financial participation. P in that is participation. I understand that. Participation, hard to participate if you don't pay. But available doesn't mean we will. That was my point. Well, I think most folks who read this would be surprised to learn that FFP is available. Here's what I'm driving at. As I understand your argument, I think you're telling us that if a state decides to pay, to ask from the federal government up to the maximum available, there is nothing the federal government can do about it. If all the other rules are satisfied, that is exactly what we're saying, except the only thing the federal government can do about it is change the rules. But you're saying the maximum, if the state chooses to take advantage of it, is also the minimum. There's no ability in the federal government, through its agency process, to ask the state to accept anything less than the maximum. Is that right? Well, most states do not pay. I asked a question. Is that right? Can the agency ask the state? Is there no way for the federal agency to reject a request from the state that is at the maximum? That is correct. Assuming you've met all the other requirements, and there are others, but if you've met all the other requirements and your payment is not in excess of the maximum that the regulation allows. And any state that asks for less than the maximum is leaving money on the table. Oh, no, no. That is not at all true. It may be true in this case. This is a unique case because for most of the services, the federal government. Well, you just told me that if the state asks for the maximum, it's entitled to it. And then I said, well, that means the state that does not ask for the maximum is leaving money on the table. You said that's not true, so there's something I'm missing. Here's why it's not true. Because, number one, the state can leave money on the table only if we're talking about payments to public facilities, which includes tribes. Because only public facilities can transfer funds back to the state. So under the rules, you cannot pay. If the state were to pay the maximum to private facilities, it would have to come up with the entire state share itself. Oh, I understand that. Public hospitals, though. That works, doesn't it? Yes. Where this works primarily is public hospitals, and in some instances, public nursing homes, although that's the part that the changed regulations pretty well did away with. Pretty much hospitals. You've just barely run over your time. We've got your argument, I think, pretty well in hand. Let's hear it from the other side, and then we'll give you a chance to rebut. Thank you. Good morning. Gerard Keating representing the respondents in this matter. Of course, there are four named respondents. For the sake of simplicity, I will refer to the lead sub-agency, the Centers for Medicare and Medicaid Services, as CMS, or the Secretary of Health and Human Services, who, of course, is ultimately responsible for the final decision at issue here. I think it's appropriate to also refer to the Secretary because, really, there are two sub-agencies within the department that are involved in this case. There's CMS, which issued the final decision here, but there's also the Indian Health Service, and they figure importantly in this matter also. I, too, would like to provide just a little bit of background, but focused in a very different way, not on the intergovernmental transfer aspect of this matter that Mr. Miller emphasizes. I think that can be overemphasized here. That is not the main basis for the final agency decision. It figures in to the reasoning process, I think it's safe to say, but it is not the reason that this state plan amendment was disapproved. On the other hand, you have to help me a little bit. Without the intergovernmental transfer, then the system would provide a lot of money for Indian services. I mean, a lot of money. I mean, they're getting 10 percent now. Without the intergovernmental transfer, they would get 100 percent. And so I think intergovernmental transfer is pretty significant because the state is using it to help as to try to subsidize their general Medicaid. So you handle it any way you want to, but, I mean, if you want to give 100 percent to the Indian services, I think they'd be really glad to get it. Well, the Secretary certainly understands that if it were not a public facility and the amendment were approved, then it would be 100 percent. But, of course, the issue is, should the amendment be approved in the first place? And that really is what the final agency decision is about. The administrator of CMS decided to disapprove the amendment because the proposal was not consistent with economy and efficiency, the statutory standard. Moreover, the so-called upper payment limit regulation, the administrator found, was not really complied with here either. So, again, the final agency decision goes to the lawfulness, the validity of the proposed methodology. It does not turn on primarily the intergovernmental transfer aspect of this. I think, in other words, I think the same decision would have been reached even if there were no 10 percent, 90 percent intergovernmental transfer aspect to the case. And that, does it start where I was starting with, where you find the initial reimbursement rate, in this case the private hospital? Well, the status, I think it's important in this case to start with the status quo. What does Alaska's state plan amendment currently provide? Basically, it says that for tribal facilities, for inpatient hospital services, that they will be paid what's known as the all-inclusive rate, which is a per diem rate paid by the state to the tribal facilities. That rate is calculated by the Indian Health Service. The Indian Health Service bases that rate on its survey of costs incurred by tribal facilities. And under those rates, because costs tend to be much higher in Alaska than in the lower 48 states, the rates set by the Indian Health Service for Alaska native tribal facilities are much higher than they are for the lower 48. So that's the status quo. That's what the state plan amendment provides today. Now, the state wanted to change that upper payment limit so that it's based on, and as Mr. Miller said, the state plan amendment does actually track the language of the relevant upper payment limit regulation. There's no dispute about that. Basically, the proposal was to pay as much as the customary charge of the provider, but limited to the prevailing charge in the locality for comparable services in comparable circumstances. The problem that the administrator sees with the proposal is that there's really no, the state has really given no basis for why we should go beyond the all-inclusive rate established by the Indian Health Service, the one that's been used by the state, as I understand it, for about the last 10 years in its state plan amendment. The state, when it came to the federal government with this proposal, did not even say that the all-inclusive rate was somehow deficient, that it wasn't enough, that the tribal facilities couldn't make a go of it with that. And they certainly didn't come forward with any data indicating that the all-inclusive rate was deficient in some way. I think counsel admitted that. I'm not sure I'll let counsel speak for himself, but as I heard it, as they were informed that possible more money was available, they just adjusted the rate. And that's where the 90% kickback comes. There's no reason, if the Indian services were getting all they wanted at the old rate, and I don't know if there was any kickback, and if you could see a 90% kickback, that was the whole point. Indian services didn't get any more out of this deal. And so I kind of read that in the administrator's decision. I don't know, maybe I'm misreading what I'm seeing there. Well, Your Honor, the statute, I think, the standard does say there is a... Let me back up a second. Section, we have these long citations, so they all start with 42, either USC or CFR. So statutory section 1396, these are USC sites, AB, says that the secretary shall approve the state plan amendment if every condition in subsection A is satisfied. Well, one of those conditions is subsection A30A, and that's the one that says that the state's plan must include methods and procedures that will ensure that payment is consistent with economy and efficiency. Now, the state did nothing in the way of making that, shall we, whatsoever. They have given us no reason to believe that we should depart from the all-inclusive rate set by the Indian Health Service specifically for tribal facilities. Well, maybe I have a question here that doesn't make any sense, but it's sure bothering me. How can any kickback scheme satisfy economy and efficiency, including the fact that those schemes were being sanctioned earlier, continually? So if you've got a scheme where the state is allowed to take money out of the reimbursement cost of public facilities, paid back, and then put into the general, it's not being spent on travel and wine and women. It's being spent on subsidizing the Medicaid system. How does that not satisfy economy and efficiency? And if so, isn't this new amendment just another degree level change from what was being done before? Or am I missing something? Well, the whole subject, Your Honor, of intergovernmental transfers, as the court probably knows, is extremely complicated. It's a volatile political issue. It has been for years. Exactly, and that's what bothers me. It's a political issue, and yet you're using economy and efficiency to say that we've got to go around the volatile political issue that allows this intergovernmental transfer to exist, which apparently nobody wants to touch. But, Your Honor, the intergovernmental transfer here is not the reason that the state plan amendment was disapproved. Oh, I know, but you're going after economy and efficiency. If there's any intergovernmental transfer, how can that system ever be economy and efficiency? Because the entity that's getting the money is giving up the money. How can that be economy and efficiency? So if it's more, maybe you're saying that's not enough economy and efficiency. I don't know. Well, I mean, the court's points certainly are well taken. But, of course, today the only thing at issue is the final agency decision on this discreet amendment. Maybe the standard of review solves this. How do we review the final agency decision? Well, the standard of review is the familiar APA standard of review. Is the final agency decision consistent with the statute and the regulations? Is it supported by substantial evidence in the record taken as a whole? Certainly there's been no suggestion of any constitutional infirmity with the final agency decision. Let me ask you this, and it may or may not help clarify. Is it the agency's position that the words in A30A, directed to economy and efficiency, are those words, economy and efficiency, looking at the price to the Indian tribal facilities only? That is to say, is this an economically efficient price, fair price for these services? Or do the words go more broadly to the entire Medicaid system as administered by the state of Alaska? My understanding of the position taken by the administrator here is that the standard is being applied to the proposed payment methodology by which Alaska would pay the tribal facilities. In other words, just to make sure I'm narrowing in on your position, which may or may not be the position Mr. Miller wants, I suspect it's not, that is to say economy and efficiency is directed at this particular service and this particular pricing. At the way this particular type of provider will be paid for inpatient hospital services, namely tribal facilities. Yes. And being they picked out the prevailing, if this is the right term, prevailing charges of a private hospital, then the Indian facility gets reimbursed on the basis of a private hospital. That's the lack of efficiency in economy, not the fact that 90% goes scooping out. That's correct, Your Honor. That's really the second basis that the administrator cited in the final decision for disapproving the amendment. The first one is the general statutory standard that we just discussed, subsection A30A, economy and efficiency. But the decision is also based on the so-called upper payment limit regulation, again, 42 CFR, section 447.325, which states the customary charge but not more than prevailing charge formula. The administrator was simply not satisfied. We certainly recognize that the state's proposal tracks the language of our regulation. There's no dispute about that. But the final decision indicates, and this is one little piece that I picked out, the record contains no cost data to justify the increase above the IHS rate set. So it did flop down into a cost analysis. Well, ultimately, in the real world, you cannot divorce costs and charges. If charges just lose connection with reality, i.e. costs, then people won't pay the charges. So then under a standard of review and looking this over, there's got to be something deficient in the way they went to this analysis, not the fact that in the past they paid it or in the past they did certain things with regard to the rate. They're saying, you're asking for an increase. I'm looking at the increase. You didn't justify the increase. That's right. The administrator specifically said that the state might be able to justify a payment scheme that, other than the use of the Indian Health Service all-inclusive rates. But they really didn't make an effort to do that. Their position, as I understand it, is that they are not required to make any showing legally. And that's difficult to square with the statutory language that says that there has to be consistency with economy and efficiency and the regulation which says customary charges limited by prevailing charges. But that has to be fleshed out. What exactly is going to be the customary charge? The state has said simply whatever the facility charges. But they've also asked us to look at the Medicare regulations on customary charges for guidance. That's Title 18 instead of 19 Medicaid. Well, those regulations also emphasize, when talking about customary charges, does the provider actually collect the charges? If not, then it's not really a customary charge. It's just an appearance. Let me ask you the next step now. I take it that if we write this the way you're arguing, this is a new opinion in this area. I'm not sure it is, Your Honor. Well, even if it wasn't, you wouldn't need an administrator. We would be having a case saying the administrator does this all the time. Everybody does it the same way. I take it this interpretation from what counsel said, to make a change and then deny it based upon economy and efficiency is something brand new. There is nothing in the record that speaks to this kind of situation with respect to another state My knowledge there are no reported decisions similar to this either. And we'd have to write on that because we have to write upon whether there was an abuse of discretion, arbitrary or capricious in the standing. Just the very basis that I see the administrator's final decision is they said you didn't substantiate this, therefore it's not within the economy and efficiency. So we are going to be writing for the first time interpreting this. This would, to my knowledge, be the first decision on this particular kind of fact pattern. How helpful to you is Judge Alito's opinion in the Third Circuit for Pennsylvania pharmacies? Well, as the Court no doubt knows, there would seem to be some tension between the take on subsection A30A in the Third Circuit's opinion versus the take on the same provision in this Court's decision in orthopedic hospitals. A case where the federal government was not a party, but rather a provider litigated against the state of California. And in that decision, this Court interpreted, I think, subsection A30A along the lines that the administrators did here. Namely, that it applies to the provision, the consistent with economy efficiency standard applies to payments to providers. It doesn't apply at the program level as the Third Circuit seemed to find. Of course, again, the federal government was not a party in that decision, but this Court did talk at length, write at length about this particular section. And one thing I think that is really notable in this Court's decision there is the emphasis on cost data. This Court emphasized that it was hard to understand how anyone could meet this standard of consistency with economy and efficiency without marshaling any cost data. I think that comes through loud and clear in this Court's decision regarding this very same statutory provision. But even if Mr. Miller were correct, which we don't believe, that this statutory standard was exhausted when we adopted this upper payment limit regulation. And that by adopting that regulation, the only way we could ever make use of the statutory provision again would be to go back to rulemaking. We disagree with that because an agency can proceed by adjudication or by rulemaking. That's a basic tenet of administrative law. This Court emphasized it in the community hospital Monterey Peninsula decision following in the wake of the Supreme Court's Guernsey Memorial Hospital decision. In programs of the magnitude of Medicare and Medicaid, not every situation can be dealt with in rulemaking. It's fair game to take a statutory standard or a regulatory standard and apply it to the facts of a case in a particular adjudication. It happens every day in virtually every federal program. But again, putting all that aside, if Mr. Miller were correct in saying that we can't rely on this statutory provision, well, the administrator also relied on the upper payment limit regulation. And the administrator simply was not satisfied that the state had made out how the customary charges would be determined. There was no reference whatsoever to collection of charges. How the prevailing charges would be determined. We understand Anchorage versus the rest of Alaska certainly when it comes to prevailing charges. But the tribal facilities are unique. They're different than the other providers in the state. And it's legitimate for us to conclude that the comparable circumstances would be the comparable circumstances of tribal facilities, not a private facility with a very different circumstance. Okay. Thank you. Thank you very much. Mr. Miller, would you like two or three minutes from above? I think I reserved five minutes, Your Honor. Did I? Well, you may have reserved five minutes, but you used all the 32 seconds. Oh, I'm sorry. But we're not going to cut you off, so. I will be very brief. I wanted to address your point, Judge Fletcher, on whether the standard of the statute applies just to the provider or to the program as a whole because I think that's sort of a crucial point here. But the answer I would give is this, two parts. Part one, in every other case that's come up, and there have been myriad cases where state plans have been submitted, where the facility or the state has proposed to pay up to the upper payment limit without any offering of any kind of cost support for it because there wouldn't be any cost support for it. The agency has routinely approved them so long as the payment does not exceed the upper payment limit. And so it seems to me that practice reveals the interpretation of the agency in matters of this kind. And I do not see how the agency can justify taking a different view for Alaska without any intervening change in law or regulation. As to the part two of my answer would go to the cases that were cited here, the Third Circuit case and the orthopedic case. There are several things he said about the orthopedic case, but the main point I want to make about those two cases, they were cases brought by providers claiming that rates were too low. And the state sought in those cases to justify their rates. And the court's rulings said the cost data doesn't justify the rates that you're charging. You're paying too little. And in the orthopedic case, the court required the state to increase its payment for outpatient hospital services in that case. Now, whether that was a correct decision or not is sort of beside the point. As the court may know, in the Supreme Court of the United States, the Solicitor General disavowed that decision. And don't get your hopes up. Judge Fletcher in that case is a relative of mine, not me. I'm quite familiar with the case, Your Honor. I was not casting any aversion on the author's opinion, with whom I had the greatest respect. But the point I want to make is that has pretty little to do with this case. In those cases, there wasn't a regulation that defined what the lower limit was. There was nothing there in which the agency had exercised its discretion and said, here are the ground rules, now follow them. It was always a case-by-case analysis. And, in fact, the agency wasn't involved in the lawsuits in question. In this case, you have a set of rules established by the agency, which the state of Alaska has followed, just like every other state followed. And every other state's been able to do what they wanted to do, but Alaska was told no. We don't for the moment say the agency can't proceed case-by-case or by regulation. Of course it can. What it cannot do, and this goes to standard of review, Judge Vernetti, what it cannot do in deciding a case where there is a regulation that sets forth the ground rules and the interpretation that the agency will follow in this and all cases, it cannot say on an ad hoc basis, in this case I'm going to apply a different and a more restrictive approach to you. That's what happened to Alaska. That's what we think is not permitted under the Meade standard. That's not what deference permits. That's arbitrary and capricious, which is the standard of review that we ask the court to impose as it reviews and we hope reverses the decision in this case. Thank you. I think both of your very helpful arguments in a somewhat complex area. The case of Alaska Department of Health and Social Services versus Centers for Medicare and Medicaid Services is now submitted for decision. We are in adjournment until tomorrow morning. Thank you. All rise. This court is in a second. The stand is adjourned. I'll go ahead. Enjoy the rest of your stay here, by the way. Did you tour it up in here? I haven't toured it. I was here once a long time ago. Unfortunately, I'm heading back. I'm just kidding. Do you have a day or two? Actually, I'm not leaving until Saturday morning. Oh, you've got lots of time. I'm just going to try to drive and array as much as you can. You can't do a circle. No, you can't do a circle. What you need to do is take a trip down south to Seward and if you have time, go all the way home. That would probably be a two, two-and-a-half to southwest. Just one south out of here. You go along Turnagin Arm. New Seward Highway will take you right on out there. It's well worth a couple days. If you'd like to finish, take another trip. The other one is to go up north towards Denali for our national park. I know how many miles that is. By eastern standards, that will be a relatively easy drive. These are all two-lane roads. It's a curvy path, so it takes a lot of time. They're good two lanes, but there will be some traffic, motorhomes, tourists, that kind of stuff. Don't use the lower 48 standards. I didn't think so. You'll have a great time. I'm looking forward to it. Have a good trip back. Thank you. Nice meeting you.
judges: Goodwin, Brunetti, W. Fletcher